# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROBERT GRAY, | ) | |
| | ) | Civil Action No. 05-11445 DPW |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TRANSPORTATION SECURITY | ) | |
| ADMINISTRATION; EDMUND S. HAWLEY, | ) | |
| capacity as ASSISTANT SECRETARY OF | ) | |
| HOMELAND SECURITY FOR THE | ) | |
| TRANSPORTATION SECURITY | ) | |
| ADMINISTRATION; DEPARTMENT OF | ) | |
| HOMELAND SECURITY; and MICHAEL | ) | |
| CHERTOFF, in his capacity as SECRETARY | ) | |
| OF THE DEPARTMENT OF HOMELAND | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

MICHAEL J. SULLIVAN
United States Attorney

MARK T. QUINLIVAN
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
Tel: (617) 748-3606
mark.quinlivan@usdoj.gov

## <u>INTRODUCTION</u>

To prevent hijacking and other forms of violence aboard aircraft, federal law requires the Transportation Security Administration ("TSA") to notify local law enforcement agencies and airline security officers of the identity of persons known to pose, or suspected of posing, a threat to aviation security. This procedure is intended to enable the airlines to take additional precautions as appropriate and, where necessary, to prevent the individuals from boarding an aircraft altogether.

In this action, plaintiff Robert Gray seeks a preliminary injunction on the ground that TSA has placed him on the "No Fly List," thereby preventing him from traveling by air or from working as a pilot in the airline industry. This Court lacks subject matter jurisdiction to entertain plaintiff's claims. Even assuming the truth of his allegation that he has been placed on the No Fly List,[1] that list, as well as the TSA's instructions regarding the airlines' use of those list, is an "order" within the meaning of 49 U.S.C. § 46110(a), and exclusive jurisdiction over those claims therefore lies in the courts of appeals. Plaintiff also has failed to demonstrate a likelihood of success on the merits

---

[1] As is set forth in the Declaration of Lee S. Longmire ("Longmire Decl."), the Executive Director of TSA's Office of Security Standards and Regulatory Programs, public disclosure of the identity of individuals on the No Fly List or the specific criteria used to determine which individuals should be included on the list, would compromise the safety and security of airline passengers. Longmire Decl. ¶¶ 8, 10. For these reasons, TSA's regulations expressly prohibit the disclosure of the contents of Security Directives and Emergency Amendments, as well as the selection criteria to be used in screening airline passengers. Id. Therefore, defendant can neither confirm nor deny that plaintiff has been placed on the No Fly List. See Gordon v. FBI, 2005 WL 1514078, at * 4 (N.D. Cal. June 23, 2004) ("The watch lists were developed and are maintained for a law enforcement purpose. Requiring the government to reveal whether a particular person is on the watch lists would enable criminal organizations to circumvent the purpose of the watch lists by determining in advance which of their members may be questioned. Plaintiffs appear to acknowledge this risk as they are no longer requesting the watch lists themselves. While such a risk is not posed by plaintiffs, if the Court were to require the government to reveal such information to plaintiffs, it would have to require the government to do the same for all inquiries."). Accordingly, for purposes of this Memorandum, defendants will assume the truth of plaintiff's assertion that he has been placed on the No Fly List. .

of his claim that his alleged placement on the No Fly List violates his First Amendment and Due Process rights.  Finally, consideration of the other equitable factors also weighs against entry of the requested injunction.

## STATUTORY AND REGULATORY BACKGROUND

Since 1961, Congress has adopted numerous provisions designed to deter and prevent acts of violence aboard aircraft.  See, e.g., FAA Amendments of 1961, Pub. L. No. 87-197, 75 Stat. 466 (Sept. 5, 1961); Amendment to the Federal Aviation Act of 1958, Pub. L. 93-366, 88 Stat. 409 (Aug. 5, 1974); Aviation and Transportation Security Act, Pub. L. 107-71, 115 Stat. 603 (Nov. 19, 2001); Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (Nov. 25, 2002).  For many years, it has been a federal crime to commit "aircraft piracy," i.e., to seize or exercise control of an aircraft by force or violence or threat of force or violence, see 49 U.S.C. § 46502(a)(A), to board or attempt to board an aircraft with a concealed dangerous weapon, id. § 46505(b)(1), or to place or attempt to place a loaded weapon, or an explosive or other incendiary device, on an aircraft, id. §§ 46505(b)(2) and (b)(3).

Congress also has ordered the Assistant Secretary to "prescribe regulations to protect passengers and property on an aircraft * * * against an act of criminal violence or aircraft piracy." 49 U.S.C. § 44903(b).[2]  Pursuant to this authority, the government has promulgated regulations

---

[2]    Although the statute references the Under Secretary of Transportation for Security, effective August 19, 2003, the TSA amended its regulations, 49 C.F.R. chapter XII, to reflect the title change of the "Under Secretary of Transportation for Security" to the "Administrator of the Transportation Security Administration," as part of its move from the Department of Transportation to the Department of Homeland Security.  See TSA Transition to Department of Homeland Security; Technical Amendments Reflecting Organizational Changes, 68 Fed. Reg. 49718 (Aug. 19, 2003). Likewise, effective February 22, 2003, the TSA assumed much of the responsibility for aviation

which, with limited exceptions, prohibit an individual from having a weapon, explosive, or incendiary device on or about the individual's person or accessible property when the person is aboard, or attempts to board, an aircraft; when a person enters a "sterile area" of an airport (*i.e.*, a portion of an airport that provides passengers access to boarding aircraft); or "[w]hen performance has begun of an inspection of the individual's person or accessible property before entering a sterile area." 49 C.F.R. § 1540.111(a)(1); <u>see</u> <u>also</u> <u>id</u>. at § 1540.5 (defining "sterile area").

The implementing regulations also require each aircraft operator to adopt a "security program" approved by the TSA which must "[p]rovide for the safety of persons and property traveling on flights provided by the aircraft operator against acts of criminal violence and air piracy, and the introduction of explosives, incendiaries, or weapons aboard an aircraft." 49 C.F.R. §§ 1544.101(a) and 1544.103(a)(1). The regulations also provide that the TSA may issue a "Security Directive" when it determines that "additional security measures are necessary to respond to a threat assessment or a specific threat against civil aviation." 49 C.F.R. § 1544.305(a).

By statute, the Assistant Secretary must "provide for the screening of <u>all</u> passengers and property * * * that will be carried aboard a passenger aircraft * * *." 49 U.S.C. § 44901(a) (emphasis added). See 49 C.F.R. §§ 1544.201-1544.213. The Assistant Secretary is required to prescribe regulations requiring an air carrier to "refuse to transport – [] a passenger who does not consent to a search * * * establishing whether the passenger is carrying unlawfully a dangerous weapon, explosive, or other destructive substance." 49 U.S.C. § 44902(a); <u>see</u> 49 C.F.R. §§ 1540.107 and 1544.201(c). By operation of law, "[a]n agreement to carry passengers or property

---

security that was previously held by the Federal Aviation Administration ("FAA"). <u>See</u> Aviation and Transportation Security Act, Pub. L. No. 107-71, 115 Stat. 597 (2001).

in air transportation * * * is deemed to include an agreement that the passenger or property will not be carried if consent to search for [these] purpose[s] * * * is not given." 49 U.S.C. § 44902(c). Subject to implementing regulations, the statute also permits an air carrier to "refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety." 49 U.S.C. § 44902(b).

Congress also has mandated the use of a "passenger prescreening system" to identify passengers who might pose a risk to civil aviation, and to ensure that those identified are adequately screened. The statute requires the government to "ensure that the Computer-Assisted Passenger Prescreening System, or any successor system (i) is used to evaluate all passengers before they board an aircraft; and (ii) includes procedures to ensure that individuals selected by the system and their carryon and checked baggage are adequately screened." 49 U.S.C. § 44903(j)(2).

Finally, Congress has directed the Assistant Secretary to establish procedures for notifying appropriate officials "of the identity of individuals" who are "known to pose, or suspected of posing, a risk of air piracy or terrorism or a threat to airline passenger safety * * *." 49 U.S.C. § 114(h)(2). The Under Secretary (now Assistant Secretary) is also charged to establish "policies and procedures" which require air carriers "to identify individuals on passenger lists who may be a threat to civil aviation or national security" and when such an individual is identified, to prevent him or her "from boarding an aircraft" or to "take other appropriate action * * *." Id. § 114(h)(3).

The TSA has implemented these provisions through a series of Security Directives and Emergency Amendments that require air carriers to check their employee lists and passenger lists against a list of individuals (the "No Fly List") who are barred from boarding an aircraft. See Longmire Decl. ¶¶ 4-10 (attached as Exhibit A). These lists are maintained at the Terrorist Screening Center ("TSC"), which was created by the Attorney General in response to the Homeland

Security Presidential Directive (HSPD-6), dated September 16, 2003. <u>Id</u>. ¶ 9. The TSC is a multi-agency organization, which is funded and administratively managed by the Federal Bureau of Investigation ("FBI"), and is charged with consolidating the government's approach to terrorist screening and providing for the appropriate and lawful use of terrorist information in screening processes. <u>Id</u>. To accomplish this purpose, the TSC maintains the Terrorist Screening Database ("TSDB"), the consolidated federal government database of known and appropriately suspected terrorists, as well as several "screening agency" databases, including the No Fly List. <u>Id</u>. TSC exports data to the No Fly List from the TSDB on individuals who: (1) have been nominated for inclusion on the list by either the FBI or the National Counterterrorism Center, and (2) who meet specific criteria. <u>Id</u>.

**PLAINTIFF'S ALLEGATIONS**

Plaintiff, a permanent legal resident who holds a British passport, alleges that, since 1997, he has worked as a pilot for a number of domestic airlines, flying small commercial aircraft. Verified Amended Complaint ¶¶ 1, 9.

Plaintiff alleges that, on November 3, 2004, he filed an online application with TSA seeking authorization to obtain flight training on larger aircraft from CAE SimuFlite. <u>Id</u>. ¶ 12 & Exhibit A. In an electronic mail message dated December 16, 2004, TSA stated that it was unable to further process plaintiff's application and would not grant final approval for him to receive flight training due to derogatory information. <u>Id</u>. ¶¶ 13-14 & Exhibit B. In an electronic mail message to plaintiff dated January 27, 2005, TSA, through Tim Upham, Office of Transportation Vetting and Credentialing, informed plaintiff that he was denying plaintiff's request to receive flight training. <u>Id</u>. ¶¶ 20-21 & Exhibit C. In particular, the electronic mail message informed plaintiff that, based

upon materials available to TSA which Mr. Upham had personally reviewed, plaintiff was found to "pose a threat to aviation or national security," and therefore was ineligible to receive flight training pursuant to 49 C.F.R. § 1552.3.  Id. ¶ 21 & Exhibit C.  The electronic mail message further informed plaintiff that he could appeal this determination by serving upon TSA a written reply or a written request for releasable materials upon which TSA's determination was based, within 30 days of service of the determination.  Id. & Exhibit C.  The electronic mail message further informed plaintiff that TSA does not disclose classified information and reserves the right not to disclose other information that did not warrant disclosure or which was protected from disclosure by law.  Id. ¶ 23 & Exhibit C.

On February 22, 2005, plaintiff, through counsel, replied to the January 27, 2005 denial by letter.  Id. ¶ 28 & Exhibit D.  In the letter, plaintiff's counsel disputed TSA's determination and requested all documents or data upon which the determination was based.  Id. ¶ 29 & Exhibit D.  By letter dated March 24, 2005, TSA enclosed several documents that it was authorized to release and upon which the determination to deny plaintiff flight training was based.  Id. ¶ 30 & Exhibit E.  The letter further stated that TSA had made redactions in the documents for privileged information.  Id. ¶ 31 & Exhibit E.  By letter dated March 31, 2005, TSA enclosed an additional document that it was authorized to release and upon which the determination to deny plaintiff flight training was based. Id. ¶ 35 & Exhibit F.

By letter dated April 1, 2005, plaintiff, through counsel, formally appealed and/or challenged the sufficiency of TSA's response to his request for documents and information.  Id. ¶ 44 & Exhibit G.  By letter dated April 14, 2005, TSA responded to plaintiff's counsel's letter dated April 1, 2005, and stated that the documents provided on March 24 and 31, 2005, constituted "all of the documents

upon which the determination in this matter was based that TSA is authorized to release." Id. ¶ 45 & Exhibit H.  The letter further provided that plaintiff could appeal TSA's denial of his request for flight training, and that any such appeal must be filed no later than April 24, 2005.  Id. & Exhibit H.

By letter dated April 14, 2005, plaintiff, through counsel, provided formally appealed TSA's denial of his request for flight training.  Id. ¶ 46 & Exhibit I..  In the appeal, plaintiff's counsel referenced his letter of February 22, 2005; suggested that this case "may well be an instance of confusion of identities;" and objected to the procedure whereby plaintiff was assertedly "precluded from learning the most basic information concerning the basis for the adverse action taken against him." Id. Exhibit I.

By letter dated May 11, 2005, TSA, through Rodney W. Turk, Assistant Administrator, Office of Transportation Vetting and Credentialing, denied plaintiff's appeal.  Id. ¶ 47 & Exhibit J. Assistant Administrator Turk stated that: "After personally reviewing the denial and other information and materials available to TSA, I have determined that Mr. Gray poses a security threat and the denial of Mr. Gray's flight school training was appropriate." Id. Exhibit J.

Plaintiff filed the instant action in this Court on July 8, 2005, alleging violations of his rights to due process, as well as violations of the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*, and the Privacy Act, 5 U.S.C. § 552a, in connection with the denial of permission to take flight training.  On the same day, plaintiff filed a petition for review challenging the TSA's denial of his request seeking authorization to obtain flight training in the United States Court of Appeals for the First Circuit.  See Gray v. TSA, No. 05-2024.

On September 16, 2005, plaintiff filed a Verified Amended Complaint in which he alleges that, on or about September 6, 2005, TSA placed his name on the No Fly List. Verified Amended Complaint ¶ 62. Plaintiff asserts that the filing of the instant lawsuit was a substantial and motivating factor in TSA's decision to place his name on the No Fly List, and that TSA thereby retaliated against him in violation of his First Amendment rights. Id. ¶¶ 65-67. Plaintiff also alleges that such action violates his rights to due process. Id. ¶¶ 68-70. On the same day, plaintiff moved for a preliminary injunction, asserting that he is "squarely entitled to a preliminary injunction to protect him from the Government's unlawful retaliation." Memorandum in Support of Plaintiff's Motion for Preliminary Injunction ("Pl. Mem.") at 2.

On September 19, 2005, this Court directed the Government to file a response to plaintiff's motion for a preliminary injunction no later than 4:00 p.m., on September 20, 2005.

## STANDARD OF REVIEW

Whether a temporary restraining order or preliminary injunction should issue ordinarily depends upon a consideration of the following factors: (1) whether the moving party has demonstrated a likelihood of success on the merits; (2) whether the moving party has demonstrated the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest. See Air Line Pilots Ass'n v. Guilford Transp. Indus., Inc., 399 F.3d 89, 95 (1st Cir. 2005).

Although the courts ordinarily consider each of these factors, the first is paramount. The First Circuit has emphasized that "[t]he *sine qua non* of this four-part inquiry is likelihood of success on the merits; if the moving party cannot demonstrate that he is likely to succeed in his quest, the

remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v.

SpringCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). In cases in which the district court lacks subject

matter jurisdiction, the First Circuit has aptly characterized a party's likelihood of success as "nil."

Int'l Ass'n of Machinists & Aerospace Workers v. Eastern Air Lines, Inc., 826 F.2d 1141, 1145 (1st

Cir. 1987).

## ARGUMENT

### I.     PLAINTIFF CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS

#### A.     Pursuant to 49 U.S.C. § 46110(a), the Federal Courts of Appeals Have Exclusive Jurisdiction to Consider Gray's Claims

"Jurisdiction is, of necessity, the first issue for an Article III court." Telecommunications

Research & Action Center v. FCC, 750 F.2d 70, 75 (D.C. Cir. 1984). In this case, this Court lacks

subject matter jurisdiction to consider plaintiff's claims because Congress has vested exclusive

jurisdiction over challenges to the No Fly List in the courts of appeals.

**1.**  49 U.S.C. § 46110(a), provides in pertinent part, as follows:

> [A] person disclosing a substantial interest in an order issued by the
> Secretary of Transportation (or the Under Secretary of Transportation
> for Security with respect to security duties and powers designated to
> be carried out by the Under Secretary or the Administrator of the
> Federal Aviation Administration with respect to aviation safety duties
> and powers designated to be carried out by the Administrator) in
> whole or in part under this part, part B, or subsection (l) or (s) of
> section 114 may apply for review of the order by filing a petition for
> review in the United States Court of Appeals for the District of
> Columbia Circuit or in the court of appeals of the United States for
> the circuit in which the person resides or has its principal place of
> business.

49 U.S.C. § 46110(a). Pursuant to this statutory mandate, the Court of Appeals have "exclusive

jurisdiction to affirm, amend, modify, or set aside any part of the order * * *." 42 U.S.C. § 46110(c)

(emphasis added).  Consequently, when a claim implicates section 46110(a), the district court's federal question jurisdiction is preempted.  See Clark v. Busey, 959 F.2d 808, 811 (9th Cir. 1992).

The First Circuit has explained that "[t]he term 'order' is read expansively in review statutes generally, and [section 46110(a)] specifically."  Aviators for Safe & Fairer Regulation, Inc. v. FAA, 221 F.3d 222, 225 (1st Cir. 2000) (citing, e.g., New York v. FAA, 712 F.2d 806, 808 (2d Cir. 1983); Northwest Airlines, Inc. v. Goldschmidt, 645 F.2d 1309, 1313-14 (8th Cir. 1981)); see also Atorie Air, Inc. v. FAA, 942 F.2d 954, 959 n. 1 (5th Cir.1991) ("The term 'order' in this statute has been given expansive construction."); San Diego Air Sports Center, Inc. v. FAA, 887 F.2d 966, 968 (9th Cir. 1989) (joining the Fourth, Seventh, Eighth, and District of Columbia Circuits and holding that 49 U.S.C. § 1486(a), the predecessor statute to section 46110(a), "is not to be given a narrow, technical reading; instead, it is to be interpreted expansively.").  An "order" is final for purposes of section 46110(a) so long as the agency's position "is definitive and clearly expressed," and provided that no further proceedings are scheduled to take place.  See Aviators for Safe & Fairer Regulation, 221 F.3d at 225; see also Mace v. Skinner, 34 F.3d 854, 857 (9th Cir. 1994) (explaining that the term "order" in section 46110(a) "carries a note of finality, and applies to an[y] agency decision which imposes an obligation, denies a right, or fixes some legal relationship. In other words, [i]f the order provides a 'definitive' statement of the agency's position, has a 'direct and immediate' effect on the day-to-day business of the party asserting wrongdoing, and envisions 'immediate compliance with its terms,'  the order has sufficient finality to warrant the appeal offered by section [46110].") (internal quotation marks and citations omitted).

**2.** TSA has implemented the requirement that it "notify[] airline officials of the identity of individuals known to pose, or suspected of posing, a risk of air piracy or terrorism or a threat to

airline or passenger safety," <u>see</u> 49 U.S.C. § 114(h)(2), "by issuing a series of Security Directives to regulated aircraft operators and Emergency Amendments to foreign air carriers."  Longmire Decl., ¶ 7. These Security Directives establish a "No Fly List," which consists of "individuals who are prohibited from flying altogether." <u>Id</u>. ¶ 7.  The procedures to be followed when an air carrier identifies an individual on the No Fly are outlined in the Security Directives.  <u>Id</u>.

The Security Directives are issued when the TSA determines that "additional security measures are necessary to respond to a threat assessment or a specific threat against civil aviation." 49 C.F.R. § 1544.305(a); Longmire Decl. ¶ 5.  Airlines "must comply with each Security Directive * * * within the time prescribed in the Security Directive for compliance." 49 C.F.R. § 1544.305(b). Emergency Amendments are issued when the TSA determines "there is an emergency requiring immediate action with respect to safety in air transportation * * *."  49 C.F.R. § 1546.105(d); Longmire Decl. ¶ 5.  Compliance by air carriers with both Security Directives and Emergency Amendments is mandatory."  Longmire Decl. ¶ 5; <u>see also</u> 49 C.F.R. § 1544.305(b).

**3.**  The Security Directives plainly are "orders" within the meaning of section 46110(a).  The Security Directives "provide a definitive statement of the TSA position and have a direct and immediate effect on persons listed on the No Fly List, barring travel on commercial aircraft." <u>Green</u> v. <u>TSA</u>, 351 F. Supp.2d 1119, 1124 (W.D. Wash. 2005); <u>see</u> <u>Aviators for Safe & Fairer Regulation</u>, 221 F.3d at 225 (agency action is an "order" for purposes of section 46110(a) if it constitutes a "definitive and clearly expressed" position of the agency's position).  Therefore, as the one court to have considered a like claim has held, "[t]he Security Directives are 'orders' for the purposes of § 46110(a), and the courts of appeal have exclusive jurisdiction over Plaintiffs' claims. * * * [T]o the extent these Security Directives establish a No-Fly List of persons who are prohibited from

flying, or create a Selectee List resulting in persons who will be selected for additional enhanced screening and resulting delays, this Court has no subject matter jurisdiction." <u>Green</u>, 351 F. Supp.2d at 1125; <u>see also</u> <u>Gilmore</u> v. <u>Ashcroft</u>, No. 02-3444, 2004 WL 603530, at *3 (N.D. Cal. March 23, 2004) ("Because this claim squarely attacks the orders or regulations issued by the TSA and/or the FAA with respect to airport security, this Court does not have jurisdiction to hear the challenge."); <u>Los Angeles</u> v. <u>FAA</u>, 239 F.3d 1033, 1036 (9th Cir. 2001) ("§ 46110(a) encompasses orders relating to airline safety").[3]

Nor does the fact that plaintiff has alleged a deprivation of his constitutional rights alter this conclusion.  Courts have held that, if a constitutional challenge to an "order" falling within the meaning of section 46110(a) is inextricably intertwined with a review of the procedures and merits of the "order," jurisdiction remains solely in the courts of appeals.  <u>See</u>, <u>e.g.</u>, <u>Tur</u> v. <u>FAA</u>, 104 F.3d 290, 291-92 (9th Cir. 1997).  In this case, resolution of plaintiff's constitutional challenges would necessarily be inextricably intertwined with an adjudication of the procedures and merits of any Security Directives or Emergency Amendments which affect plaintiff.  <u>See</u> <u>Green</u>, 351 F. Supp.2d at 1127 ("Plaintiff's Fourth Amendment claims challenge the merits of the security and screening procedures mandated by the Security Directives, and any adjudication of Plaintiffs' Fourth Amendment claims is inescapably intertwined with a review of the Security Directives."); <u>id</u>. at 1127, 1128 ("Plaintiffs' challenge to the adoption, maintenance, and dissemination of the No-Fly List under the Fourth and Fifth Amendments is inescapably intertwined with a review of the

---

[3]  That plaintiff is seeking injunctive relief in connection with this lawsuit only serves to underscore this conclusion, inasmuch as Congress has mandated that the courts of appeals have "exclusive jurisdiction to affirm, amend, modify or set aside any part of the order" and may require "further proceedings."  49 U.S.C. § 46110(c).

procedures and merits surrounding the adoption of the No-Fly List. * * * As a result, and for the

reasons stated in this Order, this Court does not have jurisdiction to consider Plaintiffs' claims in

Count I relating to the administering and maintaining of the No-Fly List, or any resulting liberty or

property interest protected by the Fifth Amendment.").

Accordingly, because this Court lacks subject matter jurisdiction to consider plaintiff's

claims, his request for a preliminary injunction should be denied, and this action dismissed with

prejudice, see Fed. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion of the parties or

otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."),

or, alternatively, transferred to the United States Court of Appeals for the First Circuit, pursuant to

28 U.S.C. § 1631.

**B.    Plaintiff Has Failed to Show That He is Likely to Succeed on the Merits of His First Amendment or Due Process Claims**

Even were this Court to consider the merits of plaintiff's claims (which, for the reasons set

forth above, it lacks jurisdiction to do), his motion for a preliminary injunction should be denied

because he has failed to show any likelihood of success.

**1.    First Amendment Retaliation Claim**

Plaintiff asserts that his alleged placement on the No Fly List was in retaliation for the filing

of this lawsuit. To succeed on his First Amendment retaliation claim, plaintiff must show "that [his]

conduct was constitutionally protected, and that this conduct was a 'substantial factor' [or] * * * a

'motivating factor'" driving the allegedly retaliatory decision; even then, a defendant would be able

to defeat a finding of liability by showing that they "would have reached the same decision * * *

even in the absence of the protected conduct." Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,

429 U.S. 274, 287 (1977). Plaintiff cannot meet that standard.

- 13-

Plaintiff alleges that "[t]he Government's retaliatory motive is evidenced by both (1) the temporal proximity between Gray's exercise of his right to petition and the Government's decision to place him on the No-Fly List and (2) the Government's failure to put forth even an assertedly legitimate basis for its action." Pl. Mem. at 1-2. Neither assertion has merit. Even assuming the truth of plaintiff's allegation that he has been placed on the No Fly List, any such action would be consistent with agency determinations made well prior to the filing of this lawsuit. As early as December 16, 2004, TSA informed plaintiff that it was unable to further process his application for flight training and would not grant final approval for him to receive flight training due to derogatory information. See Verified Amended Complaint, Exhibit B. On January 27, 2005, TSA, through Tim Upham, Office of Transportation Vetting and Credentialing, specifically informed plaintiff that he had been found to "pose a threat to aviation or national security," and therefore was ineligible to receive flight training pursuant to 49 C.F.R. § 1552.3. Id. Exhibit C. Plaintiff's appeal of that determination was denied by TSA in a letter dated May 11, 2005, in which Rodney W. Turk, Assistant Administrator, Office of Transportation Vetting and Credentialing, stated: "After personally reviewing the denial and other information and materials available to TSA, I have determined that Mr. Gray poses a security threat and the denial of Mr. Gray's flight school training was appropriate." Id. Exhibit J. The undisputed record therefore establishes that TSA had determined that plaintiff poses a threat to aviation or national security well prior to the filing of this lawsuit.

Plaintiff complains, however, that "TSA decided at the conclusion of each of these investigations not to place Gray on either the Selectee List or the No-Fly List." Pl. Mem. at 6. That assertion belies a fundamental misunderstanding of how individuals are placed on the No Fly List.

That list is maintained not by TSA, but by the Terrorism Screening Center ("TSC"), which was created by the Attorney General in response to the Homeland Security Presidential Directive (HSPD-6), dated September 16, 2003. Longmire Decl. ¶ 9. The TSC, which is a multi-agency organization that is funded and administratively managed by the FBI, maintains the Terrorist Screening Database ("TSDB"), the consolidated federal government database of known and appropriately suspected terrorists, as well as several "screening agency" databases, including the No Fly List. Id. TSC exports data to the No Fly List from the TSDB on individuals who: (1) have been nominated for inclusion on the list by either the FBI or the National Counterterrorism Center, and (2) who meet specific criteria. Id.

Plaintiff therefore misses the mark by placing emphasis on an alleged failure by TSA to place him on the No Fly List at the conclusion of TSA's earlier investigations. As the Longmire Declaration explains, it is not within TSA's province to place individuals on the No Fly List; to the contrary, individuals who are placed on either list must be nominated for inclusion by the FBI or the National Counterterrorism Center, subject to meeting criteria established by TSA. Id. ¶ 9. To be sure, after an individual has been placed on the No Fly List, TSA will issue a Security Directive directing air carriers to implement specific security procedures and to take specific security measures with respect to those individuals who appear on that list. Id. ¶ 7. But TSA does not have authority to designate individuals for inclusion on the No Fly List. Id. ¶ 9. Hence, even assuming the truth of plaintiff's assertion that he has been placed on the No Fly List, plaintiff cannot show that he is likely to succeed on his claim that TSA placed him on that in retaliation for the filing of this lawsuit.

### 2.    Due Process Claim

To make out a claim under the Due Process Clause, plaintiff must show the existence of a "liberty or property interest" protected by the Constitution or other law, a deprivation of that interest, and a denial of adequate procedural protections.  See American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999); Board of Regents v. Roth, 408 U.S. 564, 570-71 (1972).  In this case, plaintiff cannot show that he is likely to succeed on the merits of his Due Process claim because the government has afforded him adequate procedural protections.

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands."  Morrissey v. Brewer, 408 U.S. 471, 481 (1972); Dickson v. Office of Personnel Management, 828 F.2d 32, 41 (D.C. Cir. 1987) ("[D]ue process is a flexible concept, tailored to provide a meaningful opportunity to be heard, but satisfied by no fixed formula.").  The "fundamental requirement" of due process is a meaningful opportunity to be heard.  Mathews v. Eldridge, 424 U.S. 319, 333 (1976).

The procedures instituted by TSA satisfy these constitutional requirements.  To begin with, TSA afforded plaintiff ample notice and the opportunity for a hearing in connection with the denial of his request for flight training.  TSA provided plaintiff notice of the denial; afforded him the opportunity to request releasable materials upon which TSA's determination was based; afforded him the opportunity to appeal and/or challenge the sufficiency of TSA's response to his request for documents and information; and afforded him the opportunity to appeal the denial of his request for flight training.  Although plaintiff complains that he was not afforded the opportunity to review all of the documents upon which TSA made that determination, courts have upheld TSA's authority to withhold such documents as detrimental to transportation safety.  See, e.g., Jifry v. FAA, 370 F.3d

- 16-

1174, 1182 (D.C. Cir. 2004), cert. denied, 125 S.Ct. 1299 (2005); Chowdhury v. Northwest Airlines Corp., 226 F. Supp.2d 608, 610-15 (N.D. Cal. 2004).

To the extent plaintiff's complaint is based solely on his alleged placement on the No Fly List, it is well established that post-deprivation process is constitutionally sufficient when it is impracticable to provide pre-deprivation process. See Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982). Determining whether a post-deprivation hearing satisfies the requirements of due process entails "an examination of the competing interests at stake, along with the promptness and adequacy of later proceedings." United States v. James Daniel Good Real Property, 510 U.S. 43, 53 (1993). Thus, a reviewing court should balance the private interest affected, the risk of erroneous deprivation of that interest, and the likely value of additional safeguards, against the government's interest. Id.

In this case, the Government's immense security interest in protecting against security risks posed by airmen -- particularly viewed in the wake of the September 11 attacks -- fully justifies the procedures utilized by TSA. In circumstances where advance notice would impinge on security interests of the United States, an agency may provide notice after the action is taken, see Holy Land Found. for Relief & Development. v. Ashcroft, 333 F.3d 156, 163 (D.C. Cir. 2003), cert. denied, 540 U.S. 1218 (2004); National Council of Resistance of Iran v. Dept. Of State, 251 F.3d 192, 208 (D.C. Cir. 2001), the notice provided by the agency need not include classified information, see Holy Land Foundation, 333 F.3d at 163; and the agency may do so even where the entity may argue that its "opportunity to be heard was not meaningful [because] the Secretary relied on secret information to which they were not afforded access." People's Mojahedin Org. of Iran v. State Department, 327 F.3d 1238, 1242 (D.C. Cir. 2003).

Judged by these standards, the process afforded by TSA satisfies the requirements of Due Process. An individual who believes that he or she has been wrongfully placed on the No Fly List can avail himself of TSA's Expedited No Fly List and Selectee List Clearance Procedures, which are attached as Exhibit B, and which afford individuals the opportunity to contest their placement on these lists, see Green, 351 F. Supp.2d at 1122 ("The TSA has instituted an ombudsman process whereby individuals can contest their placement on the No-Fly List."), or to establish that their placement on the No Fly List was a result of a mistaken identity. Contrary to plaintiff's assertions, due process does not require the Government to delay action in circumstances where such delay could harm the Nation's security interests. See Holy Land Foundation, 333 F.3d at 163; National Council of Resistance of Iran, 251 F.3d at 208. See generally Mathews, 424 U.S. 319, 333-34 (1976) (holding that due process "'is not a technical conception with a fixed content unrelated to time, place and circumstances,'" but rather "'is flexible and calls for such procedural protections as the particular situation demands.'"). Plaintiff's assertion that his placement on the No Fly List was "without any process at all," Pl. Mem. at 8, therefore is groundless, particularly where he has made no effort to avail himself of these procedures.

## II.  THE OTHER EQUITABLE FACTORS WEIGH AGAINST ENTRY OF THE REQUESTED PRELIMINARY INJUNCTION

A consideration of the other equitable factors also weigh against entry of the requested preliminary injunction. Congress has mandated that the TSA establish procedures for notifying airline security officers of the identity of individuals known to pose, or suspected of posing, a risk of air piracy or terrorism, or a threat to airline or passenger safety, see 49 U.S.C. § 114(h)(2), and TSA has done so by issuing Security Directives and Emergency Amendments which direct air carriers to implement specific security procedures and to take specific security measures with respect

to a group of individuals who are identified on the No Fly List.  <u>See</u> Longmire Decl. ¶¶ 7-8.  As set forth above, an individual is nominated for inclusion on the No Fly List by either the FBI or the National Counterterrorism Center, provided they meet specific criteria.  <u>Id</u>. ¶ 9.  Assuming the truth of plaintiff's assertion that he has been placed on the No Fly List, and injunction that would require TSA to remove him from any relevant Security Directives would be in the teeth of a determination that plaintiff poses or is suspected of posing a risk to airline safety, as well as his nomination to the No Fly List by the FBI or the National Counterterrorism Center, and a determination that he meets the specific criteria.  <u>Id</u>. ¶ 9.  Any such injunction would harm the United States and would be inimical to the public interest.  <u>See</u> <u>Bl(a)ck Tea Society</u> v. <u>City of Boston</u>, 378 F.3d 8, 15 (1st Cir. 2004) (holding that "making public safety a reality" is a valuable factor to consider in balancing hardships and weighing the public interest); <u>Holy Land Foundation for Relief & Development</u> v. <u>Ashcroft</u>, 219 F. Supp.2d 57, (D.D.C. 2002) (proposed injunction to unblock assets would injure the Government and harm the public interest given the strong interest in curbing the escalating violence in the Middle East and its effects on the security of the United States and the world), <u>aff'd</u>, 333 F.3d 156 (D.C. Cir. 2003), <u>cert. denied</u>, 540 U.S. 1218 (2004).

- 19-

**CONCLUSION**

For all of these reasons, this Court should deny plaintiff's request for a preliminary injunction, and dismiss this action with prejudice or, in the alternative, transfer this action to the United States Court of Appeals for the First Circuit pursuant to 28 U.S.C. § 1631.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


By: /s/ Mark T. Quinlivan
MARK T. QUINLIVAN
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
Tel: (617) 748-3606
mark.quinlivan@usdoj.gov

Dated: September 20, 2005

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ROBERT GRAY,

Plaintiff,

v.

Civil Action No. 05-11445-DPW

TRANSPORTATION SECURITY
ADMINISTRATION et al.,

Defendant.

## DECLARATION OF LEE S. LONGMIRE

I, Lee S. Longmire, do hereby declare as follows:

1.    I am the Executive Director, Office of Security Standards and Regulatory

Programs, Transportation Security Administration ("TSA"), United States Department of

Homeland Security. I have held this position since March 2003, and, until February 2005, my

title was TSA Assistant Administrator for Operations Policy. From November 2001 through

March 2003, I was the Director of Aviation Policy first for the Federal Aviation Administration

("FAA") and then for TSA, when the position transferred in March 2002. During the period

from January 1980 through November 2001, I was employed by the FAA as a civil aviation

security inspector, a Regional Civil Aviation Security Division Manager, Deputy Director and

Director of Civil Aviation Security Operations, and as the Director of Civil Aviation Security

Policy. As part of my official duties in my present position, I am responsible for the

development, coordination and issuance of policies, directives, regulations and procedures to

promote the protection of the civil aviation security system against acts of air piracy and other related criminal acts.

2.      The statements made within this Declaration are based upon my personal knowledge, information made available to me in my official capacity, and conclusions reached in accordance with such information. I make this Declaration in support of Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction.

3.      As part of the Aviation and Transportation Security Act ("ATSA"), Pub. L. 107-71 (November 19, 2001), Congress created the TSA as an agency within the United States Department of Transportation ("DOT"). Under the ATSA, the Under Secretary of Transportation for Security, as head of the TSA, was made responsible for security in all modes of transportation, and assumed all the responsibilities previously exercised by the Administrator of the FAA for civil aviation security under Chapter 449 of Title 49. By the enactment of the Homeland Security Act of 2002, the TSA, and all of its functions and personnel, were transferred, effective March 1, 2003, to DHS. Within DHS, the Under Secretary of Transportation for Security first underwent a title change to Administrator of TSA, and then to Assistant Secretary for TSA.

4.      As part of its statutory mandates with respect to aviation security, the TSA is required to provide for the screening for weapons, explosives, and other destructive substances transported by all passengers and property that will be carried aboard a passenger aircraft. The TSA also prescribes regulations to protect passengers and property on an aircraft against acts of criminal violence or aircraft piracy. To further these purposes, TSA's implementing regulations require each aircraft operator to adopt a security program, which must be approved by the agency.

5.      When the TSA determines that additional security measures (over and above those provided for in the approved security program) are necessary to respond to a specific threat against civil aviation, or a threat assessment, it issues a "Security Directive" to regulated aircraft operators. 49 C.F.R. § 1544.305(a). Similarly, in the case of a foreign air carrier, the TSA may issue an "Emergency Amendment" to the carrier's security program when it finds that there is an emergency requiring immediate action with respect to security in air transportation or in air commerce. 49 C.F.R. § 1546.105(d). Compliance by air carriers with Security Directives and Emergency Amendments is mandatory. See 49 C.F.R. §§ 1544.305(a) and 1546.105(d).

6.      The ATSA also requires that the TSA establish procedures for notifying airline security officers of the identity of individuals known to pose, or suspected of posing, a risk of air piracy or terrorism, or a threat to airline or passenger security. See 49 U.S.C. § 114(h)(2). If one of these individuals seeks to board an aircraft, the statute requires the airlines to notify appropriate law enforcement agencies, prevent the individual from boarding the aircraft, or take other appropriate action with respect to that individual. See 49 U.S.C. § 114(h)(3).

7.      The TSA has implemented these requirements by issuing a series of Security Directives to regulated aircraft operators and Emergency Amendments to foreign air carriers, which I refer to collectively below as Security Directives. These Security Directives direct air carriers to implement specific security procedures and to take specific security measures with respect to individuals who are identified on the "No Fly List." Individuals on the No Fly List are prohibited from flying altogether. The No Fly List is updated continually, and the TSA requires that air carriers monitor it closely. From time to time, the TSA revises the procedures prescribed by these Security Directives and issues new Security Directives that supersede those previously issued.

3

8.    In view of the sensitive nature of these Security Directives, I cannot describe them further on the public record without undermining the effectiveness of the procedures required and directly compromising the security of the traveling public. Disclosure of the specific security procedures to be followed by air carriers when they encounter an individual identified on the No Fly List could enable terrorists and other violent criminals to identify potential weaknesses in the current security system, and to circumvent or otherwise defeat the security measures mandated by the TSA in the directives. For these reasons, TSA's regulations expressly prohibit the disclosure of the contents of Security Directives and Emergency Amendments. See 49 C.F.R. §§ 1520.5(b)(1), (b)(2); 1544.305(f)(2).

9.    The No Fly List itself is maintained at the Terrorist Screening Center ("TSC"), which was created by the Attorney General in response to the Homeland Security Presidential Directive ("HSPD-6"), dated September 16, 2003. The TSC is a multi-agency organization, which is funded and administratively managed by the Federal Bureau of Investigation ("FBI"), and is charged with consolidating the government's approach to terrorist screening and providing for the appropriate and lawful use of terrorist information in screening processes. To accomplish this purpose, the TSC maintains the Terrorist Screening Database ("TSDB"), the consolidated federal government database of known and suspected terrorists, as well as several "screening agency" databases, including the No Fly List. TSC exports data to the No Fly List from the TSDB on individuals who:  (1) have been nominated for inclusion on the list by either the FBI or the National Counterterrorism Center, and (2) who meet specific criteria.

10.    Public disclosure of the identity of individuals on the No Fly List, or the specific criteria used to determine which individuals should be included on the list, would compromise the safety and security of passengers by providing terrorists with information that may reveal

4

which of their members have been compromised, and which of their members may board an aircraft without any form of enhanced scrutiny. For these reasons, TSA's regulations expressly prohibit the disclosure of the selection criteria to be used in screening airline passengers. See 49 C.F.R. § 1520.9(I).

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct.

Dated on the 20 day of September 2005.

Lee S. Longmire

U.S. Department of Homeland Security
Arlington, VA 22202



Transportation
Security
Administration

# TRANSPORTATION SECURITY ADMINISTRATION
# EXPEDITED NO FLY LIST AND SELECTEE LIST
# CLEARANCE PROCEDURES

♦ **Who may apply for help from this process?**

This process only applies to a person who has been delayed as a result of the No Fly List and Selectee List clearance procedures when checking in for a boarding pass for scheduled or charter flights.

NOTE: This process does not apply to persons who undergo enhanced screening at airport security checkpoints.

♦ **Who to contact:**

Transportation Security Administration (TSA), Office of the Ombudsman, at any one of the following:

Office of the Ombudsman

TSA Headquarters
601 South 12th Street – West Tower, TSA-22
Arlington, VA 22202

Phone: (571) 227-2383 or Toll-free: (866) 2-OMBUDS

Email: TSA.ombudsman@dhs.gov

♦ **How the process works:**

- A person may contact the Office of the Ombudsman as specified above if that person has been delayed when checking in for a boarding pass due to the No Fly List and Selectee List clearance procedures.
- The Office of the Ombudsman will ask the person to explain their experience to ensure that the delay they encountered is of a type that may be addressed by these procedures. Once the Office of the Ombudsman confirms that the person's experience may be addressed by these

procedures, TSA will send a Passenger Identity Verification Form to that person for completion and return.

- TSA requests that the person submit a completed Passenger Identity Verification Form to the TSA, at the address shown on the TSA letter that accompanies the form. This information may aid TSA's ability to expedite the person's check-in process for a boarding pass. Please note that only the person seeking expedited No Fly List and Selectee List clearance procedures may submit the Passenger Identity Verification Form. We ask that other individuals or organizations not act on their behalf.
- The personal information requested on the Passenger Identity Verification Form consists of two parts:
  - ◆ The first part includes: name; current address; gender; place of birth; date of birth; social security number; height; weight; hair color; eye color; and home and work telephone numbers.
  - ◆ The second part requires the person to submit <u>notarized</u> copies for at least three of the following documents: passport (including number and country); visa (including number and place of issuance); **birth certificate** (including number and place of issuance)- **If you select to use this document, it must be a <u>certified copy</u> of the original;** naturalization certificate; certificate of citizenship; voter registration card; military discharge paper; driver's license (including number and state of issuance); government identity card (city, State, or Federal); or military identification card.
- The Passenger Identity Verification Form also requires that the person sign and date the submission under: (i) a Privacy Act notice that explains the purpose and routine use of the information provided by the person; and (ii) a statement attesting to the truthfulness of the information and that knowingly and willfully making any materially false statement, or omission of a material fact, can be punished by fine, imprisonment, or both pursuant to 18 USC § 1001.
- TSA will review the submission and reach a determination of whether the Expedited No-Fly List and Selectee List clearance procedures may aid in expediting the person's check-in process for a boarding pass.
- If the Expedited No Fly List and Selectee List clearance procedures will aid in expediting the person's check-in process, TSA will contact the appropriate parties, such as the airlines, to help streamline this process for the person. TSA will also notify the person in writing of its finding. While TSA cannot ensure that these clearance procedures will relieve all delays, it should facilitate a more efficient check-in process.
- Persons who have received TSA's written notification that the check-in process for a boarding pass has been streamlined should be aware that the notification letter will not aid in their clearance at the check-in counter. No Fly List clearance and Selectee List clearance at the check-in counter is based solely on the information that TSA provides to the airlines.
- There are over 600 million travelers in the United States each year, and there are many persons involved in carrying out the No Fly List and Selectee List clearance process.
- If you encounter continuing delays in the issuance of a boarding pass during flight check-in, please contact Virginia Skroski in TSA Office of the Ombudsman at: (571) 227-1449, or e-mail: TSA.ombudsman@dhs.gov

October 20, 2004